United States District Court
Southern District of Texas
**ENTERED**
March 01, 2022
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PAVE/LOCK/PLUS II LLC, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:20-CV-3557 |
| | § | |
| EROSION PREVENTION PRODUCTS LLC, | § | |
| et al, | § | |
| | § | |
| Defendants. | § | |

## **ORDER**

Pending before the Court is Plaintiff and Counterclaim Defendant Pave/Lock/Plus II, LLC's ("Paveloc") Motion for Summary Judgment (Doc. No. 80), originally filed as a motion to dismiss.[1] Defendant and Counterclaim Plaintiff Erosion Prevention Products LLC ("EPP") filed a Response, (Doc. No. 86), Paveloc filed a Reply in Support, (Doc. No. 89), and EPP filed a Sur-Reply. (Doc. No. 97).

Also pending before the Court is Third-Party Defendant TLC Trucking & Contracting, LLC's ("TLC") Motion for Summary Judgment, (Doc. No. 82), originally filed as a motion to dismiss.[2] EPP filed a Response, (Doc. No. 87), and TLC filed a Reply in Support. (Doc. No. 90).

The Court converted Paveloc's and TLC's motions into Motions for Summary Judgment and allowed all parties to supplement their briefings. (Doc. No. 106). Paveloc and TLC jointly supplemented their motions, (Doc. No. 116), and EPP filed a response to the joint supplement, (Doc. No. 117). Paveloc and TLC subsequently filed a Joint Reply, (Doc. No. 118), and EPP filed a Sur-Reply. (Doc. No. 120).

---

[1] This Motion was converted to a Motion to Summary Judgment by the Court. (*See* Doc. No. 106).
[2] This Motion was converted to a Motion to Summary Judgment by the Court. (*See* Doc. No. 106).

On November 10, 2021, the Court held a hearing on these motions. After considering the briefings, the testimony, and the applicable law, the Court denies both Paveloc's converted Motion for Summary Judgment, (Doc. No. 80), and TLC's converted Motion for Summary Judgment. (Doc. No. 82).

## I. Background

Plaintiff Paveloc and Defendant EPP both design and construct "erosion prevention" systems. Put simply, the systems are made up of interlocking blocks and are used in retaining walls. EPP has a patent on its "Channel Lock Block" (U.S. Patent No. 8,123,435). In 2010, EPP contracted with Paveloc to manufacture the Channel Lock Block. According to EPP, when the business relationship soured, Paveloc began manufacturing a "knock off" of the Channel Lock Block using the molds that EPP had provided.

In 2020, Fort Bend County Levee Improvement District No. 2 opened a new project for bidding. It awarded the contract for the project to TLC, a general contractor providing contractor services on construction projects. TLC took bids from subcontractors for erosion prevention blocks. Both Paveloc and EPP submitted bids. TLC accepted Paveloc's bid. According to EPP, Paveloc got the project by using the alleged knock off of EPP's Channel Lock Block.

Paveloc sued EPP for declaratory judgment of noninfringement. EPP countersued and joined TLC. EPP's claims are for: patent infringement; trade dress infringement and dilution; misappropriation; unfair competition; tortious interference; and unjust enrichment. EPP claims trade dress protection for the shape of its block, as well as for the interlocking arms and sockets that its product features. Paveloc and TLC moved to dismiss each of EPP's trade dress claims, reflected in Counts II, III, IV, V, and VIII. As stated above, the Court converted these motions into motions for summary judgment. (Doc. No. 106).

## II. Legal Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the Court should not grant the motion. *Celotex*, 477 U.S. at 321–25. The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether there is evidence raising an issue of material fact upon which a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248.

## III. Analysis

Paveloc and TLC (collectively "Movants") argue that they are each entitled to partial summary judgment on Counts II–VIII—EPP's trade dress claims and related state law claims—because there is no genuine dispute of material fact that EPP's purported trade dress is "functional" and, consequently, is not entitled to trade dress protection as a matter of law. (Doc. No. 116).

"Trade dress" refers to a product design or package which acquires such distinctiveness that it serves to identify the product with its source, also known as "secondary meaning." *TrafFix*

*Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 28 (2001). Where trade dress has been established, other parties may not use the trade dress "in a manner likely to cause confusion as to the origin, sponsorship, or approval of the goods." *Id.* Trade dress protection "exists to promote competition." *Id.* Critically, however, it is well-established "that trade dress protection may not be claimed for product features that are functional." *Id.* at 29.

The Supreme Court has explained that "a product feature is functional . . . if it is essential to the user or purpose of the article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *Qualitex Co. v. Jacobson Prod. Co.*, 514 U.S. 159, 165 (1995) (cleaned up). "The word 'essential' is a term of art; '[a] feature is essential to the use or purpose of a product if it serves any significant function other than to distinguish a firm's goods or identify their source.'" *AMID, Inc. v. Medic Alert Found. United States, Inc.*, 241 F. Supp. 3d 788, 819 (S.D. Tex. 2017) (quoting *Poly–Am., L.P. v. Stego Indus., L.L.C.*, Civ No. 3:08-cv-2224, 2011 WL 3206687, at *10 (N.D. Tex. July 27, 2011)). If it is determined that the trade dress is essential, or the reason the device works, "there is no need to proceed further to consider if there is a competitive necessity for the future." *TrafFix*, 532 U.S. at 33.

"[T]he person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional." 15 U.S.C. § 1125(a)(3). Where the purported trade dress involves a prior patent, the Supreme Court has held:

> A prior patent . . . has vital significance in resolving the trade dress claim. A utility patent is strong evidence that the features therein claimed are functional. If trade dress protection is sought for those features the strong evidence of functionality based on the previous patent adds great weight to the statutory presumption that features are deemed functional until proved otherwise by the party seeking trade dress protection. Where the expired patent claimed the features in question, one who seeks to establish trade dress protection must carry the heavy burden of showing that the feature is not functional, for instance by showing that it is merely

4

an ornamental, incidental, or arbitrary aspect of the device.

*TrafFix*, 532 U.S. at 29–30.

In its Second Amended Counterclaim, EPP defines its purported trade dress as the "unique and distinctive octagonal shape and design" of its Channel Lock and Channel Lock II blocks, "as well as the unique shape and size of the interlocking arms and sockets." (Doc. No. 79 at 18). Movants present two arguments in support of their motions for summary judgment.

1. Functionality

First, they argue that EPP's trade dress is functional. To support this contention, Movants point to EPP's expired U.S. Patent No. 5,556,228 ("'228 Patent") and U.S. Patent No. 8,123,435 ("'435 Patent").

*A. Expired '228 Patent*

Beginning with the "octagonal shape and size" portion of the purported trade dress, Movants point to the language in the '228 Patent which is directed to "[a]n erosion control bloc of octagonal shape." (Doc. No. 116-2 at 2, Abstract). The '228 Patent, in its description of the patented invention, explains, "[t]he block 10 is generally octagonal in shape *which has distinct hydraulic advantages*, but which is not required to realize the basic features and advantages of the invention." (*Id.* at 9) (emphasis added). Moving to the actual claims made, the '228 Patent claims the "[a] block for controlling erosion of soil, comprising; a body formed of a substantially heavy material, said body having a peripheral side edge with eight edge faces, and a top surface and a bottom surface" in Claim 1, (*Id.* at 12), and "[t]he block of claim 7, wherein said peripheral side edge is octagonal shaped" in Claim 10. (*Id.*). Movants similarly point to Claims 11, 12, and 13, each of which refer to the "octagonal peripheral side edge" of the invention. (*Id.*).

Concerning the "shape and size of the interlocking arms," Movants argue that the '228

5

Patent makes clear that the interlocking arms "are undeniably functional and are 'the reason the device works.'" (Doc. No. 116 at 15) (quoting *Eppendorf-Netheler-Hinz GMBH v. Ritter GMBH*, 289 F.3d 351, 355 (5th Cir. 2002)). Movants point to two specific provisions in the '228 Patent to support their position. In the background description, the '228 Patent explains:

> *[I]t can be seen that a need exists for an interlocking erosion control block that substantially reduces or eliminates many of the foregoing disadvantages.* In particular, a need exists for a structurally strong interlocking block that is flexible with respect to other such blocks. A further need exists for a block of only which one type is required, is more easily manufactured, as well as installed. *A further need exists for an interlocking type of block where the breakage of the exposed arms is less likely, especially when arranged to follow a curved path. A further need exists for a simplified erosion control block that can be constructed by either the wet cast or block cast techniques.*

(Doc. No. 116-2 at 8) (emphasis added). In the abstract, the '228 Patent describes:

> An erosion control block of octagonal shape, having a pair of arms extending from a peripheral side edge thereof, and a pair of cavities formed in the block with openings to the peripheral side edge. *The block interlocks with other similar blocks and provides an effective interlocked matrix of such blocks. The arms have enlarged ends that loosely fit within the cavities, thereby allowing rotation about a vertical axis of one block with regard to another block. When two blocks are interlocked and rotated to the fullest extent, peripheral edges of the blocks abut, thereby placing a radial tension strain on the neck of the arm, rather than a lateral strain, thereby reducing the possibility of breakage of the arms.*

(*Id.* at 2, Abstract) (emphasis added).

### 2. The '435 Patent

In addition to the '228 Patent, Movants also point to the language of the '435 Patent to support their contention of functionality, arguing that it confirms that the '228 Patent "is directed to EPP's claimed octagonal shape and design, which, by EPP's own admission, affects the quality of the revetment block." (Doc. No. 116 at 14). To support the functionality of the design, the background section of the '435 Patent explains that the '228 Patent "by Smith is an example of a commercially accepted *interlocking erosion control block* that articulates to conform to the contour

6

of the ground." (Doc. 116-1 at 7) (emphasis added). Specifically concerning the octagonal shape and design, Movants point to the description section, which states:

> Much like the conventional revetment block described in U.S. Pat. No. 5,556,228, the erosion control block 10 includes angled corners 54-60 to define an octagonal-shaped revetment block 10. *With the angled corners 54-60, a square opening is formed at the location where the angled corners of four blocks meet, and the four blocks form a square.*

(Doc. No. 116-1 at 9) (emphasis added). Movants also point to Claim 7, which states:

> The revetment block of claim 1, wherein said block is octagonal shaped, including four said side edges, and four angled corners, and wherein a finger hole is located adjacent an angled corner located between two said arms.

(*Id.*, Claim 7). Movants also point to pertinent language regarding the interlocking arms. First, the '435 Patent explains in its description that "[t]he arms and sockets are shaped and sized to allow a sufficient degree of articulation between the neighbor blocks." (Doc. No. 116-1 at 8). Second, in Claim 1, the patent claims:

> A revetment block, comprising:
>
> ...
>
> at least two arms, each arm extending from a respective side edge of the body of said block;
>
> each said arm having an enlarged end connected to a respective side edge by a narrowed neck portion;
>
> at least two sockets formed inwardly from respective side edges of the body of said block;
>
> each said socket having an enlarged cavity connected by a narrowed inlet to the respective side edge of the body of said block, *each said socket adapted for receiving therein an arm of a similarly constructed neighbor block*;

(*Id.* at 10) (emphasis added).

Finally, Paveloc points to a third patent, U.S. Patent No. 7,037,037 ("'037 Patent"), further describes the interlocking nature of the blocks so that the blocks "cannot be laterally removed from

7

each other." (Doc. No. 116-3 at 11).

Taken together, Movants contend that the three patents previously filed by EPP sufficiently demonstrate the functional nature of the purported trade dress now claimed by EPP. As a result, EPP cannot raise genuine dispute of material fact as to the functionality of the purported trade dress.

In response, EPP raises a host of arguments. First, before reaching the merits of the motions, EPP contends that summary judgment is premature because fact discovery has "barely begun" with respect to the trade dress claims, noting that no written discovery had been completed nor had any depositions at the time of their response. (Doc. No. 117 at 9). While further suggesting that it plans to take discovery on the trade dress issues, the Court notes that, at the time of this Order (which is several months after briefing on this issue concluded), it has no indication that EPP has taken discovery on this issue. Whither it has or not, EPP has had ample time to do so and has not supplemented its position. Furthermore, the Court is not persuaded that much, if any, discovery is necessary for EPP to argue for the non-functionality of the trade dress because the products at issue are its own.

Moving to the merits of the motions, EPP argues that Movants have not demonstrated the absence of a genuine dispute of material fact as to functionality through the evidence they have offered. (Doc. No. 117 at 10). EPP contends that courts evaluate whether trade dress is functional by considering four factors: (1) the existence of a utility patent disclosing the utilitarian advantages of the design sought to be registered; (2) advertising by the applicant that touts the utilitarian advantages of a design; (3) facts pertaining to the availability of alternative designs; and (4) facts pertaining to whether the design results from a comparatively simple or inexpensive method of manufacture. *In re Becton, Dickinson & Co.*, 675 F.3d 1368, 1374 (Fed. Cir. 2012). EPP argues

that while a utility patent can be "strong evidence" of functionality, it is not dispositive evidence of functionality, particularly at the summary judgment stage. (Doc. No. 117 at 11–12). EPP concludes, then, that functionality is a question better put before a jury. *See Becton*, 675 F.3d at 1372.

EPP further contends that its summary judgment evidence demonstrates a genuine dispute of material fact. EPP argues that in order to make a determination as to the functionality of the purported trade dress, the Court must perform a claim construction analysis on the patent; in essence, a patent infringement analysis. (Doc. No. 117 at 14) (citing *Fuji Kogoyo Co., Ltd. v. Pac. Bay Int'l, Inc.*, 461 F.3d 675, 687–91 (6th Cir. 2007)). Movants have not offered evidence to permit the Court to do a patent infringement analysis, and therefore, EPP argues that the Court is ill-equipped to determine the functionality of the purported trade dress. (Doc. No. 117 at 15).

Next, EPP specifically points to the declaration Lee A. Smith ("Smith")—the founder of EPP and the named inventor of the EPP patents—to support its contention that the trade dress is non-functional. EPP notes that Smith declared that "while the '228 Patent discloses an octagonal shaped block, it does not disclose or more importantly claim, the specific configuration of the revetment block EPP asserts is a part of its Trade Dress." (Doc. No. 117 at 15) (citing Doc. No. 117-1 at 6). Smith further states that "the revetment block disclosed in the '228 Patent bears no resemblance to the block bear [sic] EPP Trade Dress." (Doc. No. 117-1 at 6). In sum, EPP offers Smith's declaration to argue that the EPP patents do not cover *every* octagonal revetment block with interlocking arms, that numerous shapes and sizes of revetment blocks can accomplish the same goal as EPP's blocks; thus, the specific octagonal shape of the block and the shape and size of the interlocking arms used by EPP are arbitrary design features. (*Id.* at 6–7).

EPP further argues that the purported trade dress is not functional because it is not

"essential to the purpose of revetment blocks." (Doc. No. 117 at 16). In support, it points to Smith's declaration, and the declaration of Doug Deem, an industry veteran. According to Smith, "[r]evetment blocks are used to protect embankments in stream restoration, river engineering, or coastal engineering by creating sloping structures on banks or cliffs to absorb the energy of incoming water." (Doc. No. 117-1 at 5). Smith further declares that he "wanted to develop a design that would be recognizable and distinct" and that "[n]one of the claimed features of the EPP trade dress are essential to its use as a revetment block for controlling erosion because there are numerous sizes and shapes of interlocking type revetment blocks which accomplish the same goal." (*Id.* at 6–7). Deem's declaration declares "there are no utilitarian, cost, or quality features [sic] being unfairly monopolized by EPP's Trade Dress. In fact, revetment block manufacturers can (and do) still produce effective revetment blocks in competition with EPP without using EPP's trade dress." (Doc. No. 117-6 at 5–6).

Movants, in their Reply, initially note that EPP only responds to the statements in the '228 Patent and "wholly ignores the additional functional descriptions of EPP's '037 Patent and Asserted '435 Patent." (Doc. No. 118 at 4). Movants also point out that the only evidence proffered by EPP in support of their argument is the "self-serving" declaration of Smith. (*Id.* at 7).

The Court notes that the Fifth Circuit has held "an affidavit based on personal knowledge and containing factual assertions suffices to create a fact issue, even if the affidavit is arguably self-serving." *C.R. Pittman Constr. Co., Inc. v. Nat'l Fire Ins. Co. of Hartford*, 453 F. App'x 439, 443 (5th Cir. 2011) (further explaining that "[a] party's own testimony is often 'self-serving,' but we do not exclude it as incompetent for that reason alone").

Movants, however, appear to invoke the "sham-affidavit" rule by alleging that Smith's declaration is incompetent because it is inconsistent with his allegedly contradictory statements

10

given to the USPTO. (Doc. No. 118 at 7–8). The sham-affidavit rule provides that a "party may not manufacture a dispute of fact merely to defeat a motion for summary judgment." *Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000). The rationale is that if "a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony," "the utility of summary judgment as a procedure for screening out sham issues of fact" would be reduced. *Id.*

The Court has not found a case that applied that the sham-affidavit rule in this context. While it may be true that Smith's representations to the USPTO were "sworn," nearly every case invoking the sham-affidavit rule specifically contemplates inconsistencies between a declarant's affidavit and the same declarant's deposition testimony. *See, e.g., Free v. Wal-Mart Louisiana, L.L.C.*, 15 F. App'x 765, 766–67 (5th Cir. 2020); *Hacienda Records, L.P. v. Ramos*, 718 F. App'x 223, 234–35 (5th Cir. 2018); *Valdes v. GHP Asset Co. LLC*, No. 4:19-cv-00471, 2021 WL 274430, at *11 n.11 (E.D. Tex. Jan. 26, 2021) (While not explicitly invoking the sham-affidavit rule, the court discussed an affidavit's contradictions with deposition testimony). To this Court's knowledge, Smith has not yet been deposed in this case, nor has he given any testimony in this case beyond the affidavit. While the Court is sympathetic to the Movants position, it is not convinced that the sham-affidavit rule should be applied here.

Nevertheless, the Court would be remiss if it did not acknowledge the apparent contradiction in EPP's statements to the USPTO, and the arguments it now brings. In fact, in the hearing before this Court, counsel for EPP specifically represented to the Court the utility of the shape and the interlocking arms. EPP, through its affidavits, essentially argues that the *only* purpose of the specific octagonal shape of the block, and the *only* purpose of the shape and size of

11

the interlocking arms and sockets, is to serve as a source-identifier.[3] This appears to be in direct conflict with descriptions offered in EPP's previously filed patents. As Movants point out, in the '228 Patent, EPP noted that the octagonal offers "distinct hydraulic advantages." (Doc. No. 116-2 at 9, col. 4 at 18). In the '435 and '037 Patents, EPP states that the specific octagonal shape allows for the blocks to create "square" openings when laid next to each other, which appears to be preferred. (*See* Doc. No. 116-1 at 9, col 5 at 41–42; *see also* Doc. No. 116-3 at 11, col. 4 at 35–36). With respect to the interlocking arms, EPP states in the '435 and '037 Patents that the "arms and sockets are shaped and sized to allow for a sufficient degree of articulation" between blocks, and that because of the arms and sockets, "two blocks become positively engaged in an interlocking manner and cannot be laterally removed from each another." (*See* Doc. No. 116-1 at 8, col. 4 at 38–40; *see also* Doc. No. 116-3 at 12, col. 5 at 15).

Contrary to presentations made to the Court, in the affidavits provided to the Court, EPP argues that the specific shape of the block, and the shapes and size of the arms, are arbitrary design features that offer no functional advantages. (*See, e.g.*, Doc. No. 117-1 at 7). These apparent inconsistences seem to suggest that EPP seeks to take two bites at the apple, seeking both trade dress and patent protection for the shape of the block and the shape and size of the arms. As Movants note, false, sworn representations made to the USPTO, if material, give rise to questions of inequitable conduct, which, if proven, bars enforcement of a patent. *Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1285–1293 (Fed. Cir. 2011). On the facts before it, the Court finds it difficult to see how EPP might prevail on both the patent and trade dress grounds. Moreover, while this Court is well-aware of a party's right to plead (and even prove if possible)

---

[3] "It is well established that trade dress can be protected under federal law. The design or packaging of a product may acquire a distinctiveness which serves to identify the product with its manufacturer or source." *TrafFix*, 532 U.S. at 28.

alternative legal or factual theories, it will not let a party attempt to perpetuate a fraud on the jury, nor will it be a vehicle for one to pursue unconscionable and inequitable conduct. Such conduct would invalidate the patents at issue. *See id.* at 1286–87.

Nevertheless, with the record before it, the Court finds that summary judgment is not appropriate with respect to the question of the purported trade dress's functionality at this time. While it is undoubtedly true that Movant's evidence of three utility patents is strong support for their position, the declarations of Smith and Deem offered by EPP are competent evidence to create a genuine dispute of material fact. As a result, the finder of fact is best situated to decide whether or not the purported trade dress is functional and consequently unworthy of trade dress protection. Movant's motions are denied on the functionality issue.

### 2. Secondary Meaning

In addition to non-functionality, trade dress must be "distinctive," or serve "the same source-identifying function as a trademark" to be entitled to protection. *In re Forney Indus., Inc.* 955 F.3d 940, 945 (Fed. Cir. 2020). Trade dress is "distinctive and capable of being protected if it *either* (1) is inherently distinctive *or* (2) has acquired distinctiveness through secondary meaning." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992). Where the trade dress is product design, it is only protectable "upon a showing of secondary meaning." *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 216 (2000). Trade dress has secondary meaning when "in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851, n. 11 (1982).

When evaluating whether a trade dress has secondary meaning, the Fifth Circuit has set forth seven factors for courts to consider:

> (1) length and manner of use of the mark or trade dress, (2) volume of sales, (3) amount and manner of advertising, (4) nature of use of the mark or trade dress in newspapers and magazines, (5) consumer-survey evidence, (6) direct consumer testimony, and (7) the defendant's intent in copying the trade dress.

*Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 541 (5th Cir. 1998); *see also Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 224, 248 (5th Cir. 2010).

Movants argue that EPP has not provided enough evidence to show that the purported trade dress has acquired secondary meaning. Specifically, Movants contend that the only evidence offered by EPP are conclusory allegations about sales, presenting "no facts to support EPP's *trade dress* itself serves as a source identifier of the product's origins." (Doc. No. 116 at 20) (emphasis in original). Movants also point to EPP's '435 Patent, which compares the octagonal block to the "conventional revetment block described in [the '228 Patent]." (Doc. No. 116-2). Movants argue that this comparison to a "conventional" shape makes clear that the '435 Patent's shape "cannot constitute unique, distinctive trade dress." (Doc. No. 116 at 20).

EPP points to the declarations of Steve Kole, Dan Lloyd, and Tim Boren to argue that its trade dress has acquired secondary meaning as a source-identifier. (*See* Docs. No. 117-11, 117-12, 117-13). Each declarant is an industry veteran, and each declarant testified that "EPP's Trade Dress, namely, its specific octagonal shaped block and interlocking arms as demonstrated in the EPP Channellock II block, is readily identifiable in the heavy civil construction and erosion control industries. Those involved in the heavy civil construction/erosion control industries would instantly associate the EPP Trade Dress with Lee Smith and EPP." (*Id.*).

EPP has sufficiently demonstrate a genuine dispute of material fact as to the question of secondary meaning. Therefore, Movants' Motion is denied on this issue.

## IV. Conclusion

For the foregoing reasons, Movants' Motion for Summary Judgment is denied. (Doc. No. 116).[4]

Signed at Houston, Texas, this 1st day of March, 2022.

_____
Andrew S. Hanen
United States District Judge

---

[4] Both Paveloc's Motion to Dismiss, (Doc. No. 80), and TLC's Motion to Dismiss, (Doc. No. 82), are also denied as moot since they were converted into motions for summary judgment forming the basis for Doc. No. 116.